IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:25-cv-04014-CNS

JOSUE ALDAIR ALFARO HERRERA,

      Petitioner,

v.

JUAN BALTAZAR, in his official capacity as Warden of the Aurora Contract Detention Facility,
ROBERT HAGAN, in his official capacity as Field Office Director, Denver, U.S. Immigration and Customs Enforcement,
KRISTI NOEM, in her official capacity as Secretary U.S. Department of Homeland Security,
TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement, and
PAMELA BONDI, in her official capacity as Attorney General of the United States,

      Respondents.

---

## ORDER

---

Before the Court is Petitioner Josue Aldair Alfaro Herrera's Petition for Writ of Habeas Corpus, ECF No. 1, and Motion for a Temporary Restraining Order And/Or Preliminary Injunction, ECF No. 2. The petition and motion arise from the same set of facts: Petitioner's prolonged civil immigration detention following Respondents' decision to renew his removal proceedings, despite Petitioner's Special Immigrant Juvenile status. The petition and motion seek similar relief and ask the Court to "[g]rant a writ of habeas corpus directing Respondents to immediately release [Petitioner] on his own recognizance or, in the alternative, order his immediate release and afford him a

subsequent individualized bond hearing before this Court." ECF No. 1 at 19; *see also* ECF No. 2 at 32 (requesting that "the Court issue an order. . . directing Respondents to immediately release Josue without imposing additional indefinite conditions of release").

As the briefing demonstrates that Petitioner's challenge is fundamentally legal in nature, the Court declines to hold a hearing, *see* 28 U.S.C. § 2243. As explained further below, because Petitioner's prolonged detention violates his constitutional rights, as well as Respondents' obligations under the Administrative Procedure Act, the Court GRANTS the petition and ORDERS Respondents to immediately release Petitioner from immigration detention.

## I.    BACKGROUND

Petitioner's personal history and experience in the United States' immigration system, as well as the broader immigration framework through which Petitioner has navigated, are relevant to the Court's decision. Accordingly, this section provides an overview of the relevant legal framework applicable to the Special Immigrant Juvenile designation, as well as Petitioner's personal background and experience navigating the immigration system in the United States.

### A.  Special Immigrant Juvenile Status

Beginning in 1990, Congress created Special Immigrant Juvenile (SIJ) status as part of the Immigration and Nationality Act (INA) to protect vulnerable immigrant children. *See 8* U.S.C. § 1101(a)(27)(J); 8 U.S.C. § 1255(h). In doing so, Congress intended to help "alleviate[] hardships experienced by some dependents of United States juvenile courts by providing qualified [noncitizens] with the opportunity to apply for special

immigrant classification and lawful permanent resident status, with [the] possibility of becoming citizens of the United States in the future." *See* Immigration Act of 1990, Pub. L. No. 101-649, § 153, 104 Stat. 4978 (1990) (amending various sections of the INA); Special Immigrant Status, 58 Fed. Reg. 42843, 43844 (Aug. 12, 1993); *see also Osorio-Martinez v. Att'y Gen. United States of Am.*, 893 F.3d 153, 163 (3d Cir. 2018) ("Congress established SIJ status in 1990 in order to 'protect abused, neglected or abandoned children who, with their families, illegally entered the United States'") (citing *Yeboah v. U.S. Dep't of Justice*, 345 F.3d 216, 221 (3d Cir. 2003)).

SIJ status is not easily granted. "Pursuant to § 1101(a)(27)(J), applicants must complete a two-step process before receiving SIJ status," *Joshua M. v. Barr*, 439 F. Supp. 3d 632, 657 (E.D. Va. 2020), and noncitizen youths must "satisfy[] a set of rigorous, congressionally defined eligibility criteria," *Osorio-Martinez*, 893 F.3d at 163. To be eligible for SIJ status, a noncitizen youth must be (1) present in the United States; (2) dependent on a state juvenile court or placed in the custody of the state or someone appointed by the state; (3) unable to reunify with one or more parents due to abuse, neglect, or abandonment; and (4) a state juvenile court must determine that it is not in the noncitizen youth's best interest to return to their country of origin. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c). Once those requirements are met, the noncitizen youth must then "submit an application to [U.S. Citizenship and Immigration and Services (USCIS)], which includes the state juvenile court order, demonstrating his or her statutory eligibility." *Joshua*, 439 F. Supp. 3d at 657 (citation omitted). "After satisfying these two steps, the Secretary of Homeland Security, generally through USCIS's directors, must

consent to the grant of SIJ status for each applicant." *Id.* (citing *Osorio-Martinez*, 893 F.3d at 170).

The design of the SIJ program "show[s] a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for [lawful permanent residence (LPR)] status." *Garcia v. Holder*, 659 F.3d 1261, 1271 (9th Cir. 2011) (abrogated on other grounds). In furtherance of this goal, Congress removed numerous barriers for an SIJ beneficiary applying for an adjustment of status to become a LPR. For example, under the INA, SIJ beneficiaries are "deemed . . . to have been paroled into the United States" for the purposes of adjustment of status. 8 U.S.C. § 1255(h)(1).[1] Put differently, parole permits the SIJ beneficiary to lawfully remain in "the United States for purposes of adjustment [of status]," which is "the process an individual, like [Petitioner], can use to apply for [LPR] status when present in the United States." *Joshua*, 439 F. Supp. 3d at 660; *see also* 8 U.S.C. § 1255(h). This makes sense, and is indeed crucial, for SIJ beneficiaries because SIJ status can only be maintained if the recipient is "*present* in the United States." 8 U.S.C. § 1101(a)(27)(J) (emphasis added). Moreover, "[t]o apply for permanent residency," an SIJ beneficiary "must not be 'removable' from the United States." *Joshua*, 439 F. Supp. 3d at 660.

---

[1] Although parole does not constitute a noncitizen's "legal admission to the United States as defined by the INA," *Bustos v. Mayorkas*, No. CV 20-1348 KG/SMV, 2021 WL 3931173, at *2 (D.N.M. Sept. 2, 2021) (citing 8 U.S.C. § 1182(d)(5)(A)), "[p]arole generally comprises 'an administrative practice whereby the government allows an arriving [noncitizen] who has come to a port-of-entry without a valid entry document to be temporarily released from detention and to remain in the United States pending review of his immigration status," *Joshua*, 439 F. Supp. 3d at 660 (citing *Ibragimov v. Gonzales*, 476 F.3d 125, 131 (2d Cir. 2007)).

Despite providing a potential pathway for lawful permanent resident status, an SIJ beneficiary "may wait years for the opportunity to file for adjustment of status." *Id.* at 661 n.19. This "delay comes from the prohibition against filing a Form I-485 application, (the form used to apply for register permanent residence or adjustment of status), until a visa becomes available." *Id.* And because there are limits on "the number of immigrants from a given country who may receive visas during each fiscal year, a visa is not always immediately available to each person who has received SIJ status." *Id.* (citations omitted). As a result, for "immigrants from Honduras, like [Petitioner], are forced to apply for adjustment of status to become a permanent resident using a staggered timeline based on visa availability." *Id.* (citing *Osorio-Martinez*, 893 F.3d at 160 n.3). SIJ beneficiaries are thus assigned a priority date, which determines when they may apply for an adjustment of status. *See Casa Libre/Freedom House v. Mayorkas*, 637 F. Supp. 3d 805, 810 (C.D. Cal. 2022) ("When the demand is higher than the number of immigrant visas available for a given year, the government allocates the availability of immigrant visas according to a 'priority date' USCIS provides the SIJ upon approval of a petition. . . . Noncitizens, including SIJ petitioners, must wait for their priority dates to become 'current' before they can apply for adjustment of status.") (citation omitted).

In addition to providing a pathway for lawful permanent residence, Congress also created certain protections for SIJ status youths by exempting them from many common grounds of inadmissibility and creating a generous waiver of many of the non-exempted inadmissibility grounds. See *Joshua,* 439 F. Supp. 3df at 657–58 ("SIJ status . . . provides significant benefits for young immigrants and certain protections against removal.") (citing

8 U.S.C. § 1255). Specifically, and relevant to Petitioner's case here, Congress prohibited consideration of 8 U.S.C. § 1182(a)(6)(a) (noncitizens present without admission or parole) and 8 U.S.C. § 1182(a)(7)(A) (documentation requirements for immigrations) when determining an SIJ beneficiary's admissibility to the United States for purposes of an adjustment of status. *See* 8 U.S.C. § 1255(h)(2) (providing that "paragraphs (4), (5)(A), (6)(A), (6)(C), (6)(D), (7)(A), and (9)(B) of section 1182(a) [(Inadmissible noncitizens)] of this title shall not apply" when determining an SIJ beneficiary's admissibility). In addition, the INA also provides that certain grounds for removal "shall not apply to [SIJ beneficiaries] based upon circumstances that exist before the date the [noncitizen] was provided such special immigrant status." *Joshua*, 439 F. Supp. 3d at 656 (citation omitted). Accordingly, under the INA, an SIJ beneficiary cannot "be removed for having entered the country somewhere other than at an official checkpoint." *Id.* (citing 8 U.S.C. § 1227(c)). Likewise, "the INA exempts SIJ designees from inadmissibility based on the lack of 'valid entry document[s],'" *Osorio-Martinez*, 893 F.3d at 163 (citing 8 U.S.C. § 1182(a)(7)(A)(i)(I)).

Just as significant as the removability protections are the "host of procedural rights designed to sustain [the SIJ beneficiaries'] relationship to the United States and to ensure they would not be stripped of SIJ protections without due process." *Id.* at 171. Once granted, SIJ status may be revoked only for "good and sufficient cause," as determined by an authorized USCIS officer. 8 U.S.C. § 1155; 8 C.F.R. § 205.2.[2] In the event of

---

[2] USCIS regulations also permit the automatic revocation of SIJ status in certain circumstances not relevant here. *See* 8 C.F.R. § 204.11(j).

revocation, USCIS regulations require that SIJ status beneficiary receive notice of the revocation and an opportunity to submit evidence in opposition. *See* 8 C.F.R. § 205.2. If SIJ status is revoked, the youth is entitled to notice and the opportunity to appeal the decision. *See id.* §§ 205.2(c) & (d).

### B. Petitioner's Personal History

Petitioner is a native and citizen of Honduras. ECF No. 10-1 ¶ 4. In Honduras, Petitioner lived with his mother who struggled and was unable to provide him with the necessary shelter, support and supervision. ECF No. 1-2 ¶¶ 4–7. Petitioner's father was not involved in his life after childhood, and he did not receive any financial or parental support from his father through much of his teenage years. *Id.* ¶ 8. After eighth grade, Petitioner stopped attending school and began working in construction six days a week to support his family. *Id.* ¶¶ 4–5. This job was dangerous and resulted in Petitioner suffering multiple serious injuries. *Id.* ¶ 5. Despite informing her of his injuries, Petitioner's mother did not attempt to seek medical care for him. *Id.* Petitioner's safety and life were also threatened by gang members in Honduras, including on one occasion when gang members placed a gun to Petitioner's head after falsely accused him of theft. *Id.* ¶ 6.

Fearing for his safety, Petitioner, age 16 at the time, arrived in the United States in September 2019 without his parents, claiming fear of persecution should he return to Honduras. ECF No. 1-1 ¶¶ 8–9. Immigration officials encountered Petitioner after his entry into the United States and designated him an unaccompanied child ("UAC"). ECF No. 10-1 ¶ 6. United States Customs and Border Protection (CBP) issued a Notice to Appear (NTA) initiating Petitioner's removal proceedings and charging him with being deportable

pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). *Id.* ¶ 7. Petitioner was detained in juvenile housing while in removal proceedings. *Id.* ¶ 8.

On December 14, 2020, Petitioner filed a Form I-589, Application for Asylum and for Withholding of Removal, with USCIS as a UAC. *Id.* ¶ 9. On April 6, 2021, while in state custody in Arizona, Petitioner obtained an order from the Honorable Ken Sanders in the Juvenile Division of the Superior Court of the State of Arizona in and for the County of Pima—a necessary step to Petitioner obtaining SIJ status. *See* ECF No. 1-2. In his order, Judge Sanders determined that based on the neglect he suffered from his mother and abandonment from his father, reunification between Petitioner and his parents was not viable. *Id.* ¶¶ 17–18. The Court further found that returning Petitioner to his country of origin, Honduras, was "not in [Petitioner's] best interest because there is no one to safely care for him in Honduras," *id.* ¶ 19, and concluded that it is in "[Petitioner's] best interest to stay in the United States," *id.* ¶ 20. The court further determined that Petitioner was a dependent child and affirmed his placement with the Office of Refugee Resettlement (ORR). *Id.* ¶¶ 21–22. On May 10, 2021, the Department of Homeland Security (DHS) subsequently moved to dismiss Petitioner's removal proceedings under 8 U.S.C. § 1158(b)(3)(C) based on USCIS having initial jurisdiction over Petitioner's asylum application as an UAC. ECF No. 10-1 ¶ 11. On May 13, 2021, the Immigration Judge (IJ) granted the motion to dismiss. *Id.* ¶ 12.

On June 9, 2021, Petitioner filed a Form I-360 petition seeking SIJ status, *id.* ¶ 13, which USCIS approved and granted Petitioner parole on July 21, 2021, *id.* ¶ 15.[3] Further, on May 12, 2022, USCIS granted Petitioner "deferred action," *id.* ¶ 16, as part of his SIJ status, which temporarily defers Petitioner's removal from the United States as part of USCIS's policy aimed at allowing noncitizen youth to remain in the United States and obtain employment authorization while they await the chance to apply for permanent residency. *See Vieira v. De Anda-Ybarra*, No. EP-25-CV-00432-DB, 2025 WL 2937880, at *1 (W.D. Tex. Oct. 16, 2025) ("Form I-360's approval granted Petitioner deferred action status, meaning that he was authorized to remain in the United States while waiting for the visa bulletin to file for his adjustment of status to become a legal permanent resident."). Petitioner's "priority date" for when he is qualified to apply for permanent residency is June 9, 2021. ECF No. 1 ¶ 49. However, due to limited visa availability, as of December 2025, only those with a priority date prior to September 1, 2020, can be approved for permanent residency. *Id.*

On September 13, 2021, not long after Petitioner's removal proceedings were dismissed, Petitioner was released from ORR custody, ECF No. 10-1 ¶ 14; ECF No. 1-4—a determination that required finding that Petitioner was neither a flight risk nor a danger to the community, *see* 8 U.S.C. § 1232(c)(2)(A) (requiring the government to "consider danger to self, danger to the community, and risk of flight" prior to releasing a UAC from custody); *see also* 45 C.F.R. § 410.1201. Following his release, Petitioner was

---

[3] Although the declaration submitted by Gary Zolock, the ICE Deportation Officer assigned to Petitioner's case, states that Petitioner was "never . . . paroled into the United States," ECF No. 10-1 ¶ 5, this is untrue. As discussed in further detail below, by virtue of his receipt of SIJ status (which Respondents do not dispute), Petitioner was paroled into the United States on July 21, 2021.

accepted into the Unaccompanied Refugee Minor (URM) program in Massachusetts. ECF No. 1 ¶¶ 33–34. While in the URM program and awaiting his opportunity to apply for LPR status based on his priority date, Petitioner lived in supportive independent living housing, graduated from high school, and enrolled in community college. *Id.* 1 ¶ 36. Petitioner voluntarily chose to remain in the URM program after turning 18, as he was permitted to do. *Id.* ¶ 34.

After receiving employment authorization in connection with his grant of deferred action in October 2022, Petitioner held numerous jobs, including working most recently with the company "El Toro Fashion," where he traveled across the country transporting goods. *Id.* ¶ 38. In the spring of 2025, Petitioner learned that his girlfriend was pregnant. ECF No. 1-1 ¶ 15. In a declaration submitted in connection with his habeas application, Petitioner explained that he took the delivery job as a way to "save money for when my child was born and for when I could not work as much once college started." *Id.* ¶ 17.

On May 25, 2025, while driving in connection with his delivery job, Petitioner was arrested during a traffic stop in Laramie County, Wyoming. *See* ECF No. 1 ¶¶ 39–40; ECF No. 10-1 ¶ 17. After paying bond, Petitioner was informed that his release from Laramie County Jail was delayed due to a hold from United States Immigration and Customs Enforcement (ICE), which had "concluded that Petitioner is subject to removal" because he "did not possess documentation authorizing his entry into or presence in the United States." ECF No. 10-1 ¶ 18; *see also* ECF No. 1 ¶ 41. The same day, ICE took Petitioner into custody, reinitiated removal proceedings against him, and issued a new NTA, charging Petitioner pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) for being "present in the

United States without being admitted or paroled." ECF No. 10-1 ¶¶ 19–21. DHS ICE later added additional grounds for Petitioner's removal and charged him pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I) (immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document). *Id.* ¶ 26. In July 2025, USCIS sent Petitioner notice, devoid of any explanation or reasoning, stating that it was terminating Petitioner's period of deferred action and revoking his employment authorization. ECF No. 1 ¶ 44 (citing ECF No. 1-8).

On June 9, 2025, Petitioner appeared pro se for a bond hearing before an IJ pursuant to 8 U.S.C. § 1226(a). ECF No. 10-1 ¶ 23. At the hearing, the IJ placed the burden of proof on Petitioner and denied his bond, as Petitioner put forth no evidence in support of his request for release. *Id.* Per his declaration, Petitioner did not understand that he was obligated to provide evidence and ultimately declined the IJ's opportunity to delay the hearing until an attorney could attend because Petitioner wanted to return home to be there for the birth of his first child, who was born 10 days later. ECF No. 1-1 ¶ 22.

On August 5, 2025, Petitioner appeared before the IJ for a master calendar hearing. ECF No. 10-1 ¶ 28. After Petitioner admitted to the allegations and charges, the IJ sustained the removal charges and directed Honduras as Petitioner's country of removal, *id.*, despite the Arizona state court's prior conclusion (and Respondents previous acceptance of this conclusion) that returning Petitioner "to his country of origin, Honduras, is not in [his] best interest," ECF No. 1-2 ¶ 19. While in detention, Petitioner has attended additional master calendar hearings and a custody redetermination hearing, but due to

his UAC status, only USCIS (and not the IJ) has jurisdiction over Petitioner's pending asylum application, which must be considered before an IJ can assess the removal claims. *See* ECF No. 10-1 ¶¶ 330, 32–33, 35; ECF No. 1 ¶ 45. Although Petitioner has moved to terminate his removal proceedings, the IJ denied both his termination motion and motion to reconsider. ECF No. 10-1 ¶ 37; ECF No. 1 ¶ 46. The immigration court continues to reset the case for hearings every two weeks based on DHS's assurances that USCIS will expedite his asylum interview. However, on December 2, 2025, USCIS announced that it is halting the adjudication of all asylum decisions regardless of nationality.[4]

Petitioner is currently detained at the ICE Denver Contract Detention Facility in Aurora, Colorado, ECF No. 1 ¶ 41, and his removal proceedings remain pending, ECF No. 10-1 ¶ 38. Since being in detention, Petitioner's girlfriend gave birth to their child, who is currently in the custody of the Massachusetts Department of Child and Family Services. ECF No. 1 ¶ 48.[5] Petitioner filed this petition seeking habeas relief and requesting that the Court enter an order either immediately releasing him or requiring that Respondents provide Petitioner with a new bond hearing where the government bears the burden. *Id.* at 60. Petitioner asks to be released so that, among other reasons, "he can meet his newborn daughter and ensure that he does not lose his parental rights" and also resolve the charges pending against him in Wyoming. *Id.* ¶ 48.

---

[4] *See* Dep't of Homeland Security, USCIS Policy Memorandum, "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by [Noncitizens] from High-Risk Countries," (December 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf.

[5] Not long after becoming pregnant, Petitioner's girlfriend was arrested and detained. *Id.*

## II.     LEGAL STANDARD

District courts may grant a writ of habeas corpus to any person who demonstrates he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The individual in custody bears the burden of proving that his detention is unlawful. *Walker v. Johnston*, 312 U.S. 275, 286 (1941).

## III.     ANALYSIS

Petitioner's habeas petition seeks relief based on three grounds and argues that by re-detaining and prolonging his detention, Respondents have violated Petitioner's Fifth Amendment substantive and procedural due process rights. ECF Nos. 1, 2. Petitioner also argues that Respondents' actions violate the Administrative Procedure Act (APA) based on DHS's arbitrary, capricious, and internally inconsistent actions. *Id*. Respondents filed a response opposing Petitioner's requested relief, arguing that the Court does not have jurisdiction to grant certain of the relief that Petitioner seeks. *See* ECF No. 10 at 18–22. Respondents' opposition is not persuasive, particularly in light of its near complete failure to address Petitioner's arguments regarding his unique SIJ status and the protections it affords. Where, as here, "a party files a response to a motion but does not address all arguments which the motion raises, the party has effectively conceded the arguments which it does not address." *Series 17-03-615 v. Teva Pharms. USA, Inc.*, 785 F. Supp. 3d 904, 935 (D. Kan. 2025) (citation omitted); *see also C1.G ex rel. C.G. v. Siegfried*, 38 F.4th 1270, 1282 (10th Cir. 2022) (holding that the district court correctly dismissed plaintiff's facial challenge as "abandoned" where plaintiff failed to include that challenge in his response to arguments raised in defendant's motion to dismiss).

As explained further below, the Court is satisfied that it has jurisdiction to consider Petitioner's habeas application. Additionally, it finds that based on the numerous safeguards and rights Congress has granted SIJ beneficiaries, Petitioner's prolonged re-detention attendant to the renewed removal proceedings is irreconcilable with Petitioner's SIJ status and violates Petitioner's substantive due process rights. This is particularly so given that ORR previously released Petitioner, and Respondents do not now even attempt to argue that Petitioner is a flight risk or danger to the community. Moreover, Petitioner continues to be held in immigration detention despite Respondents' new policy that precludes the review of Petitioner's pending asylum application for the indefinite future. Likewise, the process that Petitioner has been afforded thus far in his renewed removal proceedings is constitutionally inadequate and in violation of his procedural due process rights. Finally, the internally inconsistent positions taken by DHS and ICE on one hand, and USCIS on the other, with respect to Petitioner's attempted removal on grounds from which he is statutorily exempted is arbitrary and capricious and in violation of the Administrative Procedures Act. In light of these violations, the Court grants Petitioner's habeas application and orders his immediate release, with no conditions of supervised release, from immigration detention.

**A. Jurisdiction**

The Supreme Court has explained that 28 U.S.C. § 2241 "implements the constitutional command that the writ of habeas corpus be made available . . . to test the legality of a given restraint on liberty." *Jones v. Cunningham*, 371 U.S. 236, 238 (1963). Respondents do not dispute that, to the extent Petitioner challenges both the "fact [and]

duration of [his] confinement," the Court has jurisdiction. *Basri v. Barr*, 469 F. Supp. 3d 1063, 1066 (D. Colo. 2020). Indeed, "[h]abeas corpus review is available under Section 2241 if an immigration detainee is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Id.* (citing 28 U.S.C. § 2241(c)(3)).

Despite this, Respondents raise two primary jurisdictional challenges to Petitioner's claims, neither of which succeeds. First, Respondents argue that under 8 U.S.C. § 1252(g), the Court does not have jurisdiction to hear a challenge to Respondents' decision to reinitiate Petitioner's removal proceedings, primarily because Petitioner's SIJ status does not exempt him from removal proceedings. *See* ECF No. 10 at 20–22. But this misconstrues Petitioner's request for relief. As noted in Petitioner's reply brief (and confirmed by a review of Petitioner's initial briefing), Petitioner is "not challeng[ing] the government's decision to initiate removal proceedings," ECF No. 11 at 10; rather, Petitioner challenges the *fact* and *duration* of his immigration-related detention and seeks immediate release as a remedy for his constitutional and APA challenges. Thus, the jurisdictional bar in 8 U.S.C. § 1252(g) that strips courts of jurisdiction to "hear any cause or claim by or on behalf of any [noncitizen] arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any [noncitizen]," is inapplicable.

Respondents' second jurisdictional challenge fails for largely the same reason. Respondents contend that Petitioner's argument that his removal would amount to a de facto revocation of his SIJ status without due process is not ripe because Petitioner has not yet been ordered removed and his SIJ status has not been revoked. ECF No. 10 at

15

19–20. But, as noted, this is not the basis of Petitioner's grievance. And as Petitioner clarified, that removal would amount to a de facto revocation of his SIJ status is relevant to and supportive of his Fifth Amendment claims, but it does not change the fact that the thrust of Petitioner's grievance is focused on the fact of his detention, and that he seeks his immediate release, and not the termination of his removal proceedings, as relief. *See* ECF No. 11 at 8–9. Thus, Respondents' second challenge fails.

Having dispensed with Respondents' jurisdictional challenges, the Court turns to the merits of Petitioner's claims.

### B. Substantive Due Process

It is undisputed that Congress has plenary power over immigration, however, that power is subject to constitutional limitations. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (citations omitted). With respect to the rights of a noncitizen held in civil immigration detention, as Petitioner is here, "Supreme Court jurisprudence emphasizes . . . the government's need to show a compelling justification for such detention in the absence of an adjudicated crime." *Diaz-Ceja v. McAleenan*, No. 19-cv-00824-NYW, 2019 WL 2774211, at *8 (D. Colo. July 2, 2019). Indeed, "the Supreme Court has held that civil detention violates due process absent 'certain special and 'narrow' nonpunitive 'circumstances,' where a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (citing *Zadvydas*, 533 U.S. at 690).

Petitioner argues that Respondents can provide no legitimate, let alone compelling, justification to support his prolonged re-detention and that, accordingly, this

detention violates his due process rights. ECF No. 1 ¶¶ 148–151.[6] Petitioner does not have a final order of removal and notes that due to the protections granted to SIJ beneficiaries, as well as due to the recent USCIS policy halting its review of all pending asylum applications, Petitioner's removal proceedings cannot proceed, and so his detention continues with no end in sight. *Id.* ¶¶ 47, 49. Petitioner further argues that, as an SIJ beneficiary, his detention serves no legitimate, non-punitive objective because it is based purely on conduct that pre-dates his receipt of SIJ status and otherwise undermines Congress's intent of permitting those with SIJ status to remain in the country to pursue lawful permanent residency. *Id.* ¶¶ 148-49. In response, Respondents contend that Petitioner's detention is authorized by 8 U.S.C. § 1226(a), which permits immigration officials to detain noncitizens while their removal proceedings are pending, and that SIJ beneficiaries have no blanket exemption from removal. *See* ECF No. 10 at 2, 3, 20–21. While Respondents are correct that, as a general matter, 8 U.S.C. § 1226(a) provides the government with discretion to detain noncitizens in removal proceedings, noncitizens still "have a substantive due process right to be free of *arbitrary* confinement pending deportation proceedings." *Doherty v. Thornburgh*, 943 F.2d 204, 209 (2d Cir. 1991) (emphasis added). Moreover, Respondents' arguments wholly ignore the unique situation that Petitioner is in as an SIJ beneficiary and, specifically, as an SIJ beneficiary in 2026 with a pending asylum application.

---

[6] Because it is clear that many of the arguments Petitioner raises in support of his procedural due process claim are cross applicable to his substantive due process claim, this order addresses those arguments in this section as appropriate.

The facts Respondents chose to ignore in their opposition undermine the legitimacy of Petitioner's prolonged detention for at least four reasons. First, as an SIJ beneficiary, Petitioner must be afforded an opportunity to apply for an adjustment of status with USCIS before he can be ordered removed; however, he has been unable to do so yet because due to his priority date he is not yet eligible to apply based on visa limitations. Second, because Petitioner was designated as an UAC, USCIS (and not DHS or ICE) has sole, exclusive jurisdiction over his asylum application, and that application—which is now on hold indefinitely—must be resolved before an IJ can order that Petitioner be removed. Third, there is no indication that the Arizona state court's 2021 determination that Petitioner is neither a flight risk nor a danger has changed, and Respondents do not argue otherwise or offer any justification for Petitioner's continued confinement. Fourth, based on the numerous safeguards provided to SIJ beneficiaries by Congress, the grounds on which Respondents seek Petitioner's removal are unlikely to be sustained. For these reasons, and as discussed further below, the Court finds that Petitioner's prolonged detention constitutes a violation of his substantive due process rights.

    *i.*      *As an SIJ Beneficiary, Petitioner Must be Provided an Opportunity to Apply for an Adjustment of Status Prior to Being Ordered Removed*

First, Petitioner argues that his detention, imposed in connection with his renewed removal proceedings, is improper because as an SIJ beneficiary, he must be afforded an opportunity to apply for an adjustment of status to obtain LPR status in the United States, which he cannot do if ordered removed. ECF No. 1 ¶ 80. Respondents' opposition ignores this entirely. The Court agrees with Petitioner that the statutory protections afforded to SIJ beneficiaries like Petitioner undermine the legitimacy of Respondents' pursuit of

Petitioner's removal and, as a result, Petitioner's detention incident to the renewed removal proceedings.

Under the INA, a noncitizen youth, once accepted into the SIJ program, is permitted to remain in the United Status and apply to become a LPR. *See* 8 U.S.C. § 1255(h) (deeming SIJ beneficiaries "paroled" in the United States for purposes of adjustment of status). The design and protections of the SIJ program make sense in light of the fact that (1) an application for adjustment of status cannot be filed by someone who is not physically present in the United States, 8 U.S.C. § 1255(i); 8 C.F.R. § 245.1(a); and (2) any submitted application is deemed abandoned and terminated if the applicant leaves the country, including, as is relevant here, if the applicant is removed via immigration proceedings, 8 C.F.R. § 245.2(a)(4)(ii)(A)-(B); *see also Joshua*, 439 F. Supp. 3d at 660.

As previously discussed, because limitations on visa availability have been reached, Petitioner is unable to apply for that adjustment of status at this time, despite his SIJ status. But the lack of an immediately available visa does not negate Congress's intent. As an SIJ beneficiary, Congress intended that Petitioner have an opportunity to pursue lawful permanent residence in the United States. *See Garcia*, 659 F.3d at 1271 (the design of the SIJ program "show[s] a congressional intent to assist a limited group of abused children *to remain safely in the country with a means to apply for LPR status*") (abrogated on other grounds) (emphasis added). Pursuing Petitioner's removal before he is eligible to apply for an adjustment of status "summarily strip[s]" him of his right to do so, *Osorio-Martinez*. 893 F.3d at 178–79, and by extension, holding Petitioner in detention without regard to his rights as an SIJ beneficiary serves no legitimate purpose and thus

fails to justify this extreme restriction on his liberty. *See, e.g.*, *id.* (discussing the "incompatibility of expedited orders of removal with the statutory and constitutional rights of SIJ designees" given that "Congress granted SIJ designees a clear set of rights, including eligibility to apply for adjustment to LPR status, protection against having their SIJ status revoked without statutorily prescribed process, and the due process rights that automatically attach to statutory rights").

> ii.  *Because Petitioner Was Designated an UAC, Before Petitioner is Ordered Removed, USCIS Must Resolve His Pending Asylum Application, Which is Now On Hold Indefinitely*

Petitioner also argues that his detention serves no legitimate purpose because he cannot be ordered removed until his pending asylum application is resolved and, due to Petitioner's UAC status, only USCIS, and not an IJ, has initial jurisdiction to do so. ECF No. 1 ¶ 151. Petitioner also notes that his detention is not simply prolonged, but has no end in sight at this point, in light of the recent USCIS memorandum indefinitely halting its review of all asylum applications.[7] *Id.* ¶ 47. Respondents again ignore these facts. But the Court refuses to do so.

That an IJ lacks jurisdiction to finalize an order of removal against Petitioner at this time significantly undermines the legitimacy of Petitioner's continued detention in pursuit of his removal. *See* 8 U.S.C. § 1158(b)(3)(C) (providing that "[a]n asylum officer . . . shall

---

[7] *See* Dep't of Homeland Security, USCIS Policy Memorandum, "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by [Noncitizens] from High-Risk Countries," (December 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf.

have initial jurisdiction over any asylum application filed by an [UAC]").[8] Moreover, USCIS's recent decision to halt its review of all pending asylum applications adds even more uncertainty to the endpoint of Petitioner's detention. The possibility that Petitioner may be ordered removed at some undefined time in the future does not justify the extreme restraint on his liberty now. Where, as here, Petitioner is detained despite numerous procedural roadblocks that, as a practical matter, mean his removal is not "reasonably foreseeable," such "continued detention is" not "authorized" by the constitution. *See Salazar-Martinez v. Lyons*, No. 2:25-CV-00961-KG-BKM, 2025 WL 3204807, at *2 (D.N.M. Nov. 17, 2025) (citing *Zadvydas*, 533 U.S. at 690, 699). Rather being a "carefully limited exception," *Salerno*, 481 U.S. at 755, Petitioner's continued detention "constitutes a significant deprivation of liberty," *Jones v. United State*s, 463 U.S. 354, 361 (1983), without sufficient justification in violation of Petitioner's due process rights.

> ### iii.    Petitioner Was Previously Determined To Be Neither a Flight Risk Nor A Danger to The Community

Petitioner also argues that the government has no interest in detaining him because he is neither a flight risk nor a danger to the community and should thus be eligible for release on bond. ECF No. 1 ¶ 129. Respondents do not argue otherwise but contend that determination is to be made by an IJ. ECF No. 10 at 4, 9. The Court is not now independently making a finding as to Petitioner's bond eligibility; however, the Court acknowledges that an Arizona state court previously made such a determination regarding the factors relevant to such a bond release decision and finds that this fact

---

[8] *See also* USCIS Memorandum, Revised Updated Procedures for Determination of Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children and Implementation of the J.O.P. Settlement Agreement, HQRAIO 120/12a (October 30, 2025).

further supports its conclusion that Respondents lack a legitimate justification to Petitioner's continued detention.

When a non-citizen is considered for release on bond under § 1226(a), Congress identified flight risk and danger to the community as the specific factors that would justify a non-citizen's detention during his removal proceedings. 8 U.S.C. § 1226(a). These are the same factors that were considered by a court prior to Petitioner's release from ORR custody in 2021. *See* ECF No. 1-4. Thus, implicit in the fact of Petitioner's 2021 release (which Respondents do not dispute) is a determination that he is neither a danger to the community nor a flight risk. *See* 8 U.S.C. § 1232(c)(2)(A) (directing the government to "consider danger to self, danger to the community, and risk of flight" when considering the release of an UAC from ORR custody); 45 C.F.R. §§ 410.1200, 410.1201 (describing "the policies and procedures used to release, without unnecessary delay, [an UAC] from ORR custody" and providing that "when ORR determines that the detention of the [UAC] is not required either to secure the child's timely appearance before DHS or the immigration court, or to ensure the child's safety or that of others, ORR shall release a child from its custody. . .."). Respondents do not contend that those facts have changed or otherwise argue that Petitioner presents a flight risk or danger to the community such that his continued detention is justified. Instead, Respondents simply argue that the Petitioner's detention is authorized by statute and that he has already enjoyed the "extensive safeguards" that protect noncitizen's constitutional rights when they receive a § 1226(a) bond hearing. ECF No. 10 at 13. But as discussed further below, the bond hearing Petitioner received was constitutionally inadequate. And there is no indication

that the only bases on which Petitioner's detention would be justified (flight risk or danger to the community) are present here. In light of this, Respondents fail to identify any statute authorizing Petitioner's prolonged detention at this time.

   iv.  *Based on the Safeguards Granted to SIJ Beneficiaries, Congress Likely Intended for SIJ Beneficiaries to Be Exempted From Removal on the Same Grounds Respondents Now Invoke*

Finally, Petitioner argues that the grounds on which Respondents pursue his removal are improper because they are based on conduct that pre-dates Petitioner's receipt of SIJ status and which Congress has exempted from consideration. ECF No. 1 ¶¶ 65, 149. Aside from addressing this point as part of their jurisdictional challenge, Respondents fail to address the merits of Petitioner's contention or acknowledge how the bases of Petitioner's removal weighs on the legitimacy of his continued detention. *See, e.g.*, *Series 17-03-615*, 785 F. Supp. 3d at 935.

Respondents are detaining Petitioner in pursuit of, and pending the resolution of, his removal proceedings, ECF No. 10-1 ¶ 19, and identify two violations of the INA for which they argue that Petitioner is removable: 8 U.S.C. § 1182(a)(6)(A)(i), for "entry without inspection," and 8 U.S.C. § 1182(a)(7)(A)(i)(I), for not being "in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document" at the time of his application for admission into the United States. *See* ECF No. 10-1 ¶¶ 21, 26. But Congress has explicitly provided that, for SIJ beneficiaries, those grounds for inadmissibility "*shall not apply.*" 8 U.S.C. § 1255(h) (emphasis added). This means that, under the INA, such allegations cannot support Petitioner's removal because Congress has "automatically exempt[ed] SIJ designees from a set of generally applicable

grounds of inadmissibility," *Osorio*-Martinez, 893 F.3d at 163 (citing 8 U.S.C. §§ 1255(h)(2), 1182(a)), including both sections that Respondents now invoke: § 1182(a)(6)(a) and § 1182(a)(7)(A). *See* 8 U.S.C. § 1255(h)(2) (providing that "paragraphs (4), (5)(A), (6)(A), (6)(C), (6)(D), (7)(A), and (9)(B) of section 1182(a) [(Inadmissible Aliens)] of this title shall not apply" when determining an SIJ status beneficiary's eligibility for admission as an immigrant to the United States); *see also Osorio-Martinez*, 893 F.3d at 163 ("[T]he INA exempts SIJ designees from inadmissibility based on the lack of 'valid entry document[s],' —the very ground on which the Government alleges Petitioners are eligible for expedited removal.") (citing 8 U.S.C. § 1182(a)(7)(A)(i)(I)).

To be clear, the Court is not offering an opinion on the validity of Respondents' decision to renew Petitioner's removal proceedings, and it is not (and cannot) now order Respondents to terminate those proceedings. However, the Court must interrogate the validity of those proceedings because Petitioner's detention is incident to them. That Respondents have initiated Petitioner's removal based on conduct exempted by the INA further underscores the illegitimacy of Petitioner's detention and demonstrates that Respondents cannot establish the necessity of depriving Petitioner of his constitutionally protected rights.[9]

---

[9] The Court is aware of the cases Respondents cite to support their argument that noncitizens with SIJ status are not exempt from removal proceedings, but neither are binding on this Court, and the Court finds them otherwise unpersuasive. *See* ECF No. 10 at 21 (citing *Cortez-Amador v. Att'y Gen.*, 66 F.4th 429, 433 (3d Cir. 2023); *Doe v. Moniz*, No. 1:25-CV-12094-IT, 2025 WL 2576819, at *8 (D. Mass. Sept. 5, 2025)). For one, Petitioner is not challenging the fact that the government has reinitiated its removal proceedings, as noted above. However, in the Court's view, these decisions neglect to give sufficient weight to Congress's intent behind creating the SIJ program in the first place. In *Cortez-Amador*, the Third Circuit focused on the language in Section 1255(h), which "expressly states that a noncitizen with [SIJ status] shall be deemed to have been paroled for purposes of subsection (a) of that section, i.e., for adjustment of status to a legal permanent resident only." *Cortez-Amador*, 66 F.4th at 433 (emphasis added). The court in *Doe*, 2025 WL 2576819, at *8, relied on the rationale in *Cortez-Amador* to reach the same conclusion. Though

### C. Procedural Due Process

In addition to his substantive due process rights, Petitioner argues that his prolonged re-detention and the IJ's placement of the burden on him at his § 1226(a) bond hearing violated his procedural due process rights. *See generally* ECF No. 1 § II. This argument is well taken. Respondents argue otherwise and cite to decisions from the Board of Immigration Appeals (BIA) to argue that the burden of proof was properly placed on Petitioner and not the government at his bond hearing. ECF No. 10 at 4 (citing *Matter of Guerra*, 24 I. & N. Dec. at 38; *see also Matter of Adeniji*, 22 I. & N. Dec. 1102, 1111-14 (BIA 1999)). Although BIA decisions may be binding on Immigration Courts, they do not override the constitutional protections granted to noncitizens.

"It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in [removal] proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993)

---

admittedly reliant on the statutory text, this interpretation is at odds with the greater statutory scheme enacted by Congress to protect SIJ beneficiaries. But "[s]tatutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with *a view to their place in the overall statutory scheme.*'" *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citing *Roberts v. Sea–Land Services, Inc.*, 566 U.S. 93, 102 (2012)) (emphasis added); *see also id.* at 438–39 (rejecting the Ninth Circuit's plain text statutory interpretation as an "implausible reading of the statute" and looking at both the text of the statute "as a whole and with respect to" the specific provision in question to avoid an unintended, "topsy-turvy approach"). To premise the removal of an SIJ beneficiary on the same inadmissibility grounds that Congress expressly exempted from consideration when determining whether an SIJ beneficiary is eligible to apply for an adjustment of status and receive even greater benefits as an LPR is at odds with Congress's goal of providing SIJ beneficiaries with "the opportunity to apply for special immigrant classification and lawful permanent resident status, with [the] possibility of becoming citizens of the United States in the future." Immigration Act of 1990, Pub. L. No. 101-649, § 153, 104 Stat. 4978 (1990); *see also Osorio-Martinez*, 893 F.3d at 163 ("Congress established SIJ status in 1990 in order to 'protect abused, neglected or abandoned children who, with their families, illegally entered the United States'") (citing *Yeboah*, 345 F.3d at 221). Moreover, this reasoning ignores the fact that, as noted above, a noncitizen may only apply for an adjustment of status if they remain physically present in (and are not removed from) the United States. *See* 8 U.S.C. § 1255(i); 8 C.F.R. § 245.1(a); 8 C.F.R. § 245.2(a)(4)(ii)(A)-(B). Accordingly, it is this Court's position that although "the Government may ultimately remove an individual with SIJ status from the country," "the way in which the Government seeks to remove them must adequately take stock of their SIJ status," *Del Cid, et al., v. Bondi*, No. 3:25-CV-00304, 2025 WL 2985150, at *4 (W.D. Pa. Oct. 23, 2025), which Respondents fail to do here.

(citation omitted). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, (1976) (quotation omitted). As discussed above, in the context of a § 1226(a) bond hearing, this means that there must be a finding that a noncitizen is a flight risk or a danger to the community before they are detained in connection with their removal proceedings. 8 U.S.C. § 1226(a). Although the Tenth Circuit has not opined on whether the burden of proving or disproving those factors is properly placed on the government or the noncitizen, respectively, the Court agrees with other courts in this district, as well as other circuit courts nationwide, "that allocating the burden to a noncitizen to prove that he should be released on bond under § 1226(a) violates due process as it assigns the risk of error to the party with the greater interest in their individual liberty as balanced against the Government's interests." *Diaz-Ceja*, 2019 WL 2774211, at *10; *see also Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d. Cir. 2020).

Both common sense and the mechanics of the immigration system support this conclusion. For one, requiring a noncitizen to prove that they are *not* a flight risk and *not* a danger to the community is an inherently more difficult burden to meet than proving the affirmative because, "[a]s a practical matter it is never easy to prove a negative." *Elkins v. United States*, 364 U.S. 206, 218 (1960); *see also Hernandez-Lara*, 10 F.4th at 31 ("[P]roving a negative (especially a lack of danger) can often be more difficult than providing a cause for concern."). Indeed, the government is far better positioned to prove their case than a detained noncitizen given that there is no right to counsel in immigration

proceedings and that by virtue of their detention, the noncitizen has "little ability to collect evidence." *Moncrieffe v. Holder*, 569 U.S. 184, 201 (2013). In light of this, any risk of erroneously depriving a noncitizen of their constitutionally protected liberty is reduced by assigning the burden to the government, which has "substantial resources to deploy." *Velasco Lopez*, 978 F.3d at 853 (citations omitted). Shifting the burden of proof to the Government to justify continued detention also "promotes the Government's interest . . . in minimizing the enormous impact of incarceration in cases where it serves no purpose." *Velasco Lopez*, 978 F.3d at 854 (2d Cir. 2020).

Moreover, placing the burden on the government is consistent with Supreme Court decisions that have repeatedly held that the government must bear a high burden of proof to justify its interest in person's continued civil detention. *See, e.g.*, *Kansas v. Hendricks*, 521 U.S. 346, 364, 368 (1997) (upholding involuntary civil commitment of individuals convicted of sex offenses where the statute provided "strict procedural safeguards"); *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996) ("due process places a heightened burden of proof on the State in civil proceedings in which the individual interests at stake") (citation and quotation marks omitted); *see also Foucha*, 504 U.S. at 80–83 (1992); *Addington v. Texas*, 441 U.S. 418, 423 (1979); *U.S. v. Salerno*, 481 U.S. 739, 750–52 (1987).[10]

---

[10] As the Second Circuit recognized, that these Supreme Court precedents are unrelated to immigration detention is immaterial because "the 'constitutionally protected liberty interest' in avoiding physical confinement, even for [noncitizens] . . . , [is not] conceptually different from the liberty interests of citizens considered in" other cases concerning civil immigration detention. *Velasco Lopez*, 978 F.3d at 856 (internal quotation and citations omitted).

The parties disagree as to the proper test to apply and determine whether holding a § 1226(a) bond hearing where Petitioner bore the burden was sufficient to protect his due process rights. However, the Court is persuaded that by applying the three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), as Plaintiff suggests and as other circuit courts have done, supports the conclusion that doing so violated Plaintiff's procedural due process rights. *See Hernandez-Lara*, 10 F.4th 19; *Velasco Lopez*, 978 F.3d 842. In *Mathews*, the Supreme Court stated that determining whether an administrative procedure is "constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Mathews*, 424 U.S. at 334 (citation omitted). The Court articulated three factors to consider in making such an assessment, including (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. "The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action." *Id.* at 348.

Applying the facts now before the Court to the *Mathews* factors supports the Court's decision. First, it is undisputed that the private interest affected by the government's action is significant: Petitioner's liberty is at stake. This is "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). And "[i]t is

clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones*, 463 U.S. at 361. Petitioner has already been detained for over six months, and this is not the first time Petitioner was placed in immigration-related detention.[11] Accordingly, this factor weighs in Petitioner's favor.

The second *Mathews* factor, which looks at "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," *Mathews*, 424 U.S. at 335, also weighs in Petitioner's favor. As discussed above, the government is in a far better position to bear the burden at a § 1226(a) bond hearing. The government, with its extensive resources and expertise in immigration law, is better equipped to properly collect and present evidence that would allow an IJ to determine whether Petitioner is a flight risk or danger to the community. Moreover, Respondents do not propose any additional or substitute procedural safeguards under which Petitioner's rights may be better protected. Under such circumstances, it is far more probable that an IJ would reach an erroneous conclusion (as the IJ likely did here, in light of the ORR's previous finding) when it placed that burden on Petitioner.

Finally, the third *Mathew* factor, which considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," *Mathews*, 424 U.S. at 335, also weighs in Petitioner's favor. First, as a practical matter, it is likely that a government

---

[11] As previously discussed, Petitioner was also held in government custody until 2021 when he was ultimately released without a finding that he was a danger or flight risk.

attorney would attend any bond hearing and prepare and marshal evidence of any possible danger or flight risk, regardless of which party bore the burden. Requiring that the government affirmatively present its position and evidence is unlikely to change that. Second, the government has not (and likely cannot) articulate any interest in ensuring the detention of noncitizens who are neither dangerous nor a risk of flight. To the contrary, and as the Second Circuit found, "shifting the burden of proof to the Government to justify continued detention promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose." *Velasco Lopez*, 978 F.3d at 854. This is particularly true where, as here, Petitioner's pending asylum application and SIJ status prevent his immigration proceedings from moving forward.

Analysis of each of the *Mathews* factors thus weigh in Petitioner's favor. In light of "the ongoing infringement of the [Petitioner's] liberty interest and the strong tradition of placing the burden justifying civil detention on the government, the 'balance between individual and government interests requires that the burden of justifying petitioner's continued detention falls upon the government,' . . . [to] 'demonstrate by clear and convincing evidence that petitioner's ongoing detention is appropriate to protect the community and ensure petitioner's appearance at future proceedings.'" *Rodriguez v. Perry*, 747 F. Supp. 3d 911, 920 (E.D. Va. 2024) (citing *Haughton* v. Crawford, 221 F. Supp. 3d 712, 717 (E.D. Va. 2016)); *see also Hernandez-Lara*, 10 F.4th at 35 (concluding that the burden should be placed on the government at bond hearings and that analysis of the *Mathews* factors establishes that, "the private interest affected is commanding; the

risk of error from [placing the burden of proof on the noncitizen] is substantial; and the countervailing governmental interest . . . is comparatively slight") (citation and alterations omitted). The government's failure to bear that burden at Petitioner's June 2025 bond hearing violated Petitioner's Fifth Amendment procedural due process rights.

### D.  Arbitrary and Capricious Agency Action Under the APA

In addition to his constitutional challenges, Petitioner challenges Respondents' detention and reinitiation of his removal as violating the APA. ECF No. 1 ¶ 78–81. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C). Petitioner argues that (1) Respondents' pursuit of his removal directly contracts the protections afforded to him by the INA, including those enacted to ensure SIJ beneficiaries can remain in the United States to apply for an adjustment of status, *id.* ¶ 78; and (2) pursuing Petitioner's removal based on actions he took (and of which the government was aware) before he was granted SIJ status is arbitrary and capricious, including because the actions of two DHS sub-agencies—ICE and USCIS—are directly contradictory, *id.* ¶ 81. For their part, Respondents do not directly address Petitioner's arguments made in support of his APA claim. Instead, Respondents contend that any claim that Petitioner's removal would violate the APA is not yet ripe. *See* ECF No. 10 at 19–20. Respondents' failure to grapple with the implications of Petitioner's SIJ status once again dooms its opposition. *See, e.g.*, *Series 17-03-615.*, 785 F. Supp. 3d at 935. The Court agrees with

Petitioner that ICE's actions in pursuit of Petitioner's removal are arbitrary, capricious, and contrary to law for three reasons.

First, by placing Petitioner in removal proceedings and attempting to remove him from the United States, Respondents seek to erode the numerous protections to which Petitioner is entitled as a SIJ beneficiary. Under the INA, an SIJ beneficiary must be present, and remain present, in the United States to retain their SIJ status. 8 U.S.C. § 1101(a)(27)(J). Removal constitutes a direct attack on that status because effectuating Petitioner's removal to Honduras would automatically revoke his SIJ status. Respondents' pursuit of this de facto revocation of Petitioner's SIJ status flies in the face of federal regulations which provide that "SIJ status, once granted, may not be revoked except 'on notice,' and upon the [g]overnment's compliance with a series of procedural safeguards: The Secretary of Homeland Security must find 'good and sufficient cause' for revocation; the agency must provide notice of intent to revoke; and the SIJ designee must be given the opportunity to present evidence opposing revocation." *Osorio-Martinez*, 893 F.3d at 163–64 (citing 8 U.S.C. § 1155; 8 C.F.R. § 205.2; 7 USCIS Policy Manual, pt. F, ch. 7 (Mar. 21, 2018)). SIJ beneficiaries also have appeal rights for any adverse ruling. *Id.* at 164 (citing 8 C.F.R. § 205.2(d)). Despite this, Petitioner has received no such process, and Respondents do not even attempt to justify (and in fact, barely acknowledge) that the *pursuit* of Petitioner's removal now flies in the face of these protections and constitutes arbitrary and capricious agency action that directly contradicts the due process procedures granted to SIJ beneficiaries. *See Gen. Chem. Corp. v. U.S.*, 817 F.2d 844,

846 (D.C. Cir. 1987) ("internally inconsistent and inadequately explained" agency action is "arbitrary and capricious").[12]

Second, and relatedly, pursuing Petitioner's removal directly contradicts Congress's purpose in providing SIJ status—which is to provide noncitizens like Petitioner an opportunity to remain in the United States to pursue an adjustment of status and permanent residence. As discussed above, pursuing Petitioner's removal before he is even eligible to apply for an adjustment of status "summarily strip[s]" Petitioner's SIJ-related rights. *Osorio-Martinez.*, 893 F.3d at 178–79. Respondents' pursuit of Petitioner's removal, which fails to "adequately take stock of [his] SIJ Status," constitutes agency action contrary to law and is thus presumptively arbitrary and capricious. *Del Cid*, 2025 WL 2985150, at *4.

Finally, Respondents' pursuit of Petitioner's removal via ICE, despite USCIS granting Petitioner SIJ status, is directly contradictory and thus arbitrary and capricious. Both ICE and USCIS are sub-components of a single agency: DHS. *See Hohner v. U.S. Dep't of Just.*, No. CV 16-7967-GW(PLAX), 2018 WL 1942540, at *1 n.1 (C.D. Cal. Feb. 8, 2018) ("Both CBP and ICE, along with the U.S. Citizen and Immigration Services ("USCIS"), are now components of DHS.") (citation omitted). As other courts have observed, it is "peculiar that the DHS grants . . . relief pursuant to the SIJ statutes while

---

[12] Although Petitioner does not currently have a final order of removal, if any such order is issued before Petitioner receives the procedural safeguards that Congress intended to accompany a revocation of SIJ status, such removal would likely constitute another violation of Petitioner's procedural due process rights and a violation of the APA. *See, e.g.*, *Han v. United States Citizenship & Immigr. Servs.*, No. 24-CV-1221 (JGK), 2025 WL 1808854, at *3 (S.D.N.Y. June 30, 2025) ("Agency action is arbitrary and capricious if it departs from Congress's intent[.]") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

another agency within DHS, [ICE], simultaneously pursues removal. These seemingly opposing positions within the Executive Branch raise questions about the arbitrary and capricious nature of such actions and highlight 'inconsistencies between DHS' decision to grant [Petitioner's] SIJ status and to initiate his removal' simultaneously." *Joshua*, 439 F. Supp. 3d at 680. Petitioner's case here raises the same peculiarities and, like in *Joshua*, there is, at the very least, an "incompatibility between removal [and] the statutory rights" granted to Petitioner as an SIJ beneficiary. *Id.* Moreover, in light of the extensive procedural safeguards granted to SIJ beneficiaries, it is impossible to reconcile the discrepancy between ICE and USCIS's actions, which further bolsters the conclusion that DHS's renewal of Petitioner's removal is arbitrary and capricious and provides no legitimate basis for detaining Petitioner in connection his removal proceedings. *See, e.g.*, *id.* at 679–80 (declining to decide petitioner's APA claim at the time, but noting that the "inconsistencies between DHS' decision to grant [petitioner's] SIJ status and to initiate his removal" establishes that petitioner raises a claim that is "likely" to succeed "on the merits under the APA based on potentially arbitrary and capricious actions")*; Gen. Chem. Corp.*, 817 F.2d at 846 ("internally inconsistent and inadequately explained" agency action is arbitrary and capricious).

### E.  Petitioner's Request for Immediate Release

As relief for Respondents' numerous violations, Petitioner requests that the Court order his immediate release from detention. ECF No. 1 at 60. Respondents argue that even if Petitioner's rights have been violated, the proper remedy is to order a new bond

hearing before an IJ where the government bears the burden of proof, rather than order Petitioner's immediate release. ECF No. 10 at 16–17.

But Respondents' argument ignores that Petitioner was previously found not to be a flight risk or a danger to the community when he was released from ORR custody in 2021. *See* ECF No. 1-4. Moreover, requiring Petitioner to remain in detention until he is able to receive another bond hearing only prolongs Petitioner's unlawful detention, which this Court cannot permit. At this point, because it has already been determined that Petitioner is neither a flight risk nor a danger to the community, and because Petitioner has already been held in immigration detention for over six months, the Court finds that Respondents' violations of Petitioner's rights are best remedied by ordering Petitioner's immediate release from immigration detention. *See Cruz Valera v. Baltazar*, 2025 WL 3496174, at *3 (D. Colo. Dec. 5, 2025) (immediately releasing petitioner from detention where petitioner had previously been released on bond).

## IV.    CONCLUSION

For the reasons discussed above, the Court GRANTS Petitioner's Petition for Writ of Habeas Corpus, ECF No. 1, and Respondents are ORDERED to immediately release Petitioner from immigration detention with no conditions of supervised release. Because Petitioner has received the requested relief, his Motion for a Temporary Restraining Order And/Or Preliminary Injunction, ECF No. 2, is DENIED AS MOOT. Respondents are further ordered to file a status report within SEVEN DAYS of this order to certify compliance.

DATED this 13th day of January 2026.

BY THE COURT:

_____

Charlotte N. Sweeney
United States District Judge